UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

PAUL BATISTE d/b/a ARTANG
PUBLISHING, LLC

V.

RYAN LEWIS, ET AL.

CIVIL ACTION

NO. 17-4435

SECTION "F"

ORDER AND REASONS

Before the Court is the defendants' motion for summary judgment and the plaintiff's motion for leave to supplement his opposition to the motion for summary judgment. For the reasons that follow, the plaintiff's motion for leave to supplement is DENIED, and the defendants' motion for summary judgment is GRANTED.

**Background**

A New Orleans jazz musician accuses an internationally famous hip-hop duo of copyright infringement of eleven original songs. This litigation followed.[1]

Paul Batiste is a member of The Batiste Brothers Band, a New Orleans jazz band founded in 1976. Batiste also owns Artang Publishing, LLC. Batiste alleges that, between 1978 and 2002, he composed eleven original songs, entitled Hip Jazz, Kids, Starlite Pt. 1, World of Blues, Love Horizon, Tone Palette, My Bad, Salsa

---

[1] Insofar as Mr. Batiste has failed to submit any competent evidence to controvert the material facts outlined in the defendants' statement of undisputed facts, those facts are deemed admitted for the purposes of the defendants' motion. See Fed. R. Civ. P. 56(c)(1); see also Local Rule 56.2.

4 Elise (Fur Elise), Drowning in My Blues, Sportsman's Paradise, and Move That Body; he also claims that he registered each song with the United States Copyright Office.[2]  According to Batiste, his songs have been broadcast on New Orleans radio stations,

---

[2] Batiste has not produced deposit copies certified as such by the Copyright Office for any of his works.  Rather, he has submitted copyright registration certificates for his songs as follows:

- (1) World of Blues (2000) - SR0000187088 (July 18, 2000; words/music/sound recording)
- (2) Love Horizon (2000) - same as World of Blues
- (3) Drowning in my Blues (2000) - same as World of Blues
- (4) Tone Palette (2001) - PAu002628735 (Oct. 1, 2001; performance/music/lyrics); R0000733288 (Oct. 10, 2013; sound recording)
- (5) Salsa 4 Elise (Fur Elise) - same as Tone Palette
- (6) My Bad - same as Tone Palette
- (7) Hip Jazz (1997) - SRu000375811 (Sept. 4, 1997; basic registration); SR787455 (July 16, 2016; sound recording/music; "nature of authorship was not sufficiently explicit on original application")
- (8) Kids (1993) - PAu001817461 (Dec. 14, 1993 - words/music); SRu0000793483 (Sept. 26, 2017 - sound recording)
- (9) Move that Body (1999) - SRu000409184 (Oct. 12, 1999; words/ music); SRu786923 (June 10, 2016 - sound recording/ lyrics/music)
- (10) Sportsman's Paradise (1999) - same as Move that Body
- (11) Starlite Pt. 1 (1978) - PAu0063512 (Nov. 16, 1978; words/music); SR755905 (Oct. 3, 2014; sound recording)
  - o Mr. Batiste states in his sworn declaration that he authored, recorded, and released "Starlite Pt. 1" in 1978, but the sound recording copyright registration he produces for this work lists January 1, 1999 as the first date of publication.
  - o Moreover, the defendants attach to their summary judgment motion two letters from the U.S. Copyright Office, dated May 29, 2014 and March 13, 2015, in which Batiste was told that he could not register his copyright in this sound recording because he had failed to publish the work with a proper notice of copyright.

distributed to various disc jockeys, and sold in local and national record stores, on his website, and at live shows. He has also sold his music through digital platforms, although he concedes that his online sales have been "sparse."

Ryan Lewis and Ben Haggerty form the hip-hop duo known as "Macklemore and Ryan Lewis." The duo has achieved international stardom and is best known for the singles "Thrift Shop" and "Can't Hold Us," which were the most popular songs in the United States and Australia after their releases in 2012 and 2016.[3] The duo also received several Grammy awards, including those for best new artist, best album, and best rap performance.

On May 1, 2017, Batiste[4] sued Ryan Lewis and Ben Haggerty, alleging they infringed on his sound recordings and music compositions by using unauthorized samples and by copying elements of eleven of his original works in the composition of their songs Thrift Shop, Can't Hold Us, Need to Know, Same Love, and Neon Cathedral.[5] He alleges infringement of various beats, hooks, melodies, chords, and drums in his songs. Batiste also sued Andrew Joslyn and Allen Stone, who are credited with writing contributions

---

[3] "Thrift Shop" has garnered 1.1 billion views on YouTube.
[4] The complaint styles the plaintiff as Paul Batiste, doing business as Artang Publishing, LLC.
[5] Thrift Shop, Neon Cathedral, Can't Hold Us, and Same Love were released together on an album entitled "The Heist" in October of 2012, while "Need to Know" was released in February of 2016 as part of an album entitled "This Unruly Mess I've Made."

to some of the hip-hop songs, as well as the publishing companies
that own rights to the compositions, including Macklemore
Publishing, LLC, Ryan Lewis Publishing, DB Joslyn Music, and Sticky
Stones, LLC.[6]

---

[6] The defendants maintain that they independently created the
allegedly infringing works through collaborations between Lewis
and Haggerty. For support, they submit the sworn declaration of
Ryan Lewis, in which he declares, under penalty of perjury:

> 3. Each of the Macklemore & Lewis Songs was independently
> created and recorded by me and Ben Haggerty with some
> additional contributors such as Andrew Joslyn and Allen
> Stone. I was directly involved with every audio
> component of these recordings, and they do not include
> any sound recordings created by Plaintiff Paul Batiste.
>
> 4. I understand that Mr. Batiste claims that Macklemore
> & Lewis Songs sample sound recordings created by Mr.
> Batiste. This is simply not true. Prior to this lawsuit
> I had never even heard of Mr. Batiste, listened to any
> of his music, or possessed any of his sound recordings.
> As part of the discovery in this lawsuit, I, at the
> direction of counsel, turned over all of the audio files
> I had that documented the process of creating the
> Macklemore & Lewis Songs. I can confirm that none of
> Mr. Batiste's sound recordings are contained in those
> files or were sampled in the Macklemore & Lewis Songs.

During his deposition, Lewis added that he created the instrumental
component of each song, while Ben Haggerty wrote the lyrics and
verses. Lewis and Haggerty also testified during their depositions
that they had neither heard of Paul Batiste or Artang Publishing,
nor listened to any of Batiste's music prior to this lawsuit.

Seeking to prove that the defendants *did* sample his sound
recordings, Mr. Batiste points to the following evidence: (1) Ryan
Lewis's deposition testimony that he has sampled other songs to
create new musical compositions; and (2) the declaration of DaShawn
Hayes, Batiste's counsel of record, in which Hayes states that the
Pro Tools session that was used to compose and record the allegedly
infringing work, "Thrift Shop," contains "a plethora of sound
recordings of other artists," including Jay-Z and Dr. Dre, and
displays an error message that 178 audio files are missing.

The defendants moved to dismiss the complaint on September 11, 2017, but ultimately withdrew that motion after the plaintiff filed an amended complaint.  The defendants then moved to dismiss the amended complaint on November 15, 2017, but again voluntarily dismissed it after the plaintiff was granted leave to file a second amended complaint on January 19, 2018.  Thereafter, on February 20, 2018, the defendants moved to dismiss the second amended complaint.  In its Order and Reasons dated May 17, 2018, this Court denied the defendants' motion to dismiss, holding that the plaintiff's second amended complaint plausibly alleges the three requirements to a successful claim of copyright infringement: (1) ownership of a valid copyright; (2) factual copying (through allegations of striking similarity, rather than access and probative similarity, because the complaint alleges no facts regarding access); and (3) substantial similarity.  The Court declined to engage in a side-by-side analysis of the works at the pleading stage, noting that a decision on the merits based on the Court's judgment as to the songs' similarities was inappropriate at that time.

The defendants then produced reports of three musicology experts, Brian Seeger, Mr. Lawrence Ferrara, and Paul Geluso, while Batiste disclosed a report signed by Archie Milton, an alleged expert musicologist.  Contending that the Milton Report was ghost-written by the plaintiff, the defendants moved to exclude Milton's

report and testimony from consideration on summary judgment or at trial.  The defendants also moved for summary judgment, arguing that the plaintiff's copyright infringement claims fail as a matter of law because he cannot prove copyright ownership, factual copying (through striking similarity, or access and probative similarity), or substantial similarity.

On April 10, 2019, the Court granted the defendants' motion to exclude the expert report and testimony of Archie Milton.  In light of Milton's deposition testimony that the plaintiff conducted all of the analysis in the report and that Milton could not verify the accuracy of such work, the Court determined that "Mr. Batiste's involvement in the preparation of Milton's report exceed[ed] the permissible bounds of 'editorial assistance.'"  One week later, on the submission date of the defendants' motion for summary judgment, the plaintiff filed a motion for leave to supplement his opposition, in an attempt to resubmit the contents of the Milton Report as an attachment to his own declaration.

I.

Federal Rule of Civil Procedure 56 instructs that summary judgment is proper if the record discloses no genuine dispute as to any material fact such that the moving party is entitled to judgment as a matter of law.  No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.  See Matsushita Elec. Indus.

Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  A genuine dispute of fact exists only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion.  See id.  In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party.  See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992).  Rather, he must come forward with competent evidence, such as affidavits or depositions, to buttress his claims.  Id.  Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.  Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); Fed. R. Civ. P. 56(c)(2). "[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."  Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007) (internal quotation marks and citation omitted). Ultimately, "[i]f the evidence is merely colorable . . . or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249 (citations omitted); King v. Dogan, 31 F.3d 344, 346 (5th Cir. 1994) ("Unauthenticated documents are improper as summary judgment evidence.").

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  In deciding whether a fact issue exists, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party.  Scott v. Harris, 550 U.S. 372, 378 (2007).  Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013) (internal quotation marks and citation omitted)

In resolving a motion for summary judgment, the Court "may only consider admissible evidence."  Coleman v. Jason Pharmaceuticals, 540 F. App'x 302, 306 (5th Cir. 2013).  Federal Rule of Evidence 56(c)(2) provides that "[a] party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."

## II.

The Court first considers the plaintiff's motion for leave to supplement his opposition papers by attaching to his sworn declaration the contents of the Milton Report (restyled as his own).  Batiste submits that his "supplemented declaration" illustrates how the defendants used musical software to sample and

copy his musical works and, therefore, will assist the Court in analyzing his technical infringement claims.  The defendants oppose the request, contending that Mr. Batiste has neither established his qualifications to serve as an expert witness, nor demonstrated good cause to justify amending this Court's scheduling order.  The Court agrees.

*A.*

Federal Rule of Evidence 701 provides that lay testimony may not be "based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  In turn, Rule 702 permits a witness to testify as an expert only where he has demonstrated that he is "qualified as an expert by knowledge, skill, experience, training or education" and that his testimony is reliable.  Fed. R. Evid. 702; see also Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993).

Batiste's proffered exhibit, through which he opines on the similarity of various song pairings using computer-generated visual representations of music, presupposes expert as opposed to lay testimony.  Mr. Batiste has failed to establish his qualifications to serve as an expert witness in a case in which he is the plaintiff.  Nor does his report pass muster under Daubert because it is lacking in reliability.  It is simply patently self-interested.  In this regard, Mr. Batiste cannot demonstrate that: (1) the report "is based on sufficient facts or data;" (2) it "is

9

the product of reliable principles and methods;" or (3) he "has reliably applied the principles and methods to the facts of the case."  See id.

Mr. Batiste's report primarily consists of spectrogram and waveform comparisons that depict fragments of matching graphic representations of sound between his songs and those of the defendants; based on these overlapping segments, he concludes that the defendants copied his works.  The reliability of Mr. Batiste's methodology is rejected by the defendants' sound recording expert, Paul Geluso, who explains that "it is possible for two random songs to have musical events that, in a spectrogram comparison, can be seen to visually align to a degree that [the plaintiff] would declare indisputably 'digitally sampled' when no such digital sampling occurred."[7]  Similarly, Dr. Lawrence Ferrara, one of the defendants' music composition experts, explains that "fragmentary similarities between excerpts of the compositions at issue only appear[ed] after deeply flawed manipulations and **misrepresentations** in the transcriptions." (emphasis added).  Because the plaintiff's self-interested report bears no indicia of reliability, it cannot be said to pass muster under Daubert.

---

[7] To illustrate Mr. Batiste's flawed methodology, Geluso points to a spectrogram comparison of the songs "Stayin Alive" by the Bee Gees (1978) and "Back in Black" by AC/DC (1980), in which musical building blocks of the songs visually align, even though the digital sampling software referred to in the plaintiff's report did not exist at the time "Back in Black" was released.

*B.*

Evidentiary issues aside, Mr. Batiste's attempt to supplement his opposition amounts to a request to modify this Court's scheduling order.  Federal Rule of Civil Procedure 15(a)(2) allows a party to "amend its pleading only with the opposing party's written consent or the court's leave" and instructs courts to "freely give leave when justice so requires."  However, Rule 16(b)(4) provides that a court's scheduling order may be modified "only for good cause and with the judge's consent."  Fed. R. Civ. Proc. 16(b)(4).

When determining whether there is good cause under Rule 16, courts consider four factors: "(1) the explanation for the failure to timely [comply with the scheduling order]; (2) the importance of the [modification]; (3) potential prejudice in allowing the [modification]; and (4) the availability of a continuance to cure such prejudice."  Squyres v. Heico Companies, L.L.C., 782 F.3d 224, 237 (5th Cir. 2015) (quoting Meaux Surface Productions, Inc. v. Fogleman, 607 F.3d 161, 167 (5th Cir. 2010)) (alterations in original).

This Court's scheduling order provides:

Written reports of experts, as defined by Federal Rules of Civil Procedure 26(a)(2)(B), who may be witnesses for Plaintiff fully setting forth all matters about which they will testify and the basis therefor shall be obtained and delivered to counsel for Defendant as soon as possible, but in no event later than January 24, 2019.

11

. . .

> The Court will not permit any witness, expert or fact,
> to testify or any exhibits to be used unless there has
> been compliance with this Order as it pertains to the
> witness and/or exhibits, without an order to do so issued
> on motion for good cause shown.

Although Mr. Batiste invokes Rule 15's lenient standard, it is Rule 16's "good cause" standard that governs his last-minute request to submit his own self-interested musicology report to bolster his copyright infringement claims.  After submitting an expert report in the name of Archie Milton, Mr. Batiste now declares, under penalty of perjury, that he "personally conducted an analysis of [his] musical works and those of the defendants that form[] the basis of this lawsuit and discovered several acts of sampling and copying;" he then seeks to attach the Milton Report (restyled as his own) to his supplemental declaration.  Although Mr. Batiste asserts that the report will assist the Court in analyzing his technical infringement claims, he fails to the persuade the Court that his efforts to circumvent its ruling amount to "good cause."[8]

### III.

The plaintiff claims that five of the defendants' songs – "Thrift Shop," "Neon Cathedral," "Can't Hold Us," "Need to Know," and "Same Love" – infringe the musical compositions and sound

---

[8] Plaintiff's third effort to favorably restyle and divert the essentials of his case.

recordings of eleven of his original works, for a total of twelve pairs of allegedly infringing and infringed songs.

*A.*

"To prove copyright infringement, a plaintiff must establish (1) ownership of a valid copyright; (2) factual copying; and (3) substantial similarity." Armour v. Knowles, 512 F.3d 147, 152 (5th Cir. 2007) (per curiam). "Factual copying can be proved by direct or circumstantial evidence." Positive Black Talk Inc. v. Cash Money Records, Inc., 394 F.3d 357, 368 (5th Cir. 2004) (internal quotations omitted). Because direct evidence is often difficult to provide, "[f]actual copying may be inferred from (1) proof that the defendant had access to the copyrighted work prior to creation of the infringing work and (2) probative similarity." Id.

"To establish access, a plaintiff must prove that 'the person who created the allegedly infringing work had a reasonable opportunity to view the copyrighted work' before creating the infringing work." Armour, 512 F.3d at 152-53 (quoting Peel & Co v. The Rug Market, 238 F.3d 391, 394 (5th Cir. 2001)). "A bare possibility of access is insufficient." Guzman v. Hacienda Records and Recording Studio, Inc., 808 F.3d 1031, 1037 (5th Cir. 2015). Stated differently, an "access showing cannot 'be based on speculation or conjecture.'" Id. (quoting Armour, 512 F.3d at 152-53). A jury could find that two works have probative

13

similarity if "it finds any similarities between the two works (whether substantial or not) that, in the normal course of events, would not be expected to arise independently in the two works." Positive Black Talk, 394 F.3d at 370.

However, if a plaintiff cannot prove access, he may still prove factual copying "by showing such a 'striking similarity' between the two works that the similarity could only be explained by actual copying." Armour, 512 F.3d at 152 n.3; Vallery v. American Girl, L.L.C., 697 F. App'x 821, 824 (5th Cir. 2017). Two works are "strikingly similar" if the plaintiff demonstrates "that the alleged 'similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source.'" Guzman, 808 F.3d at 1039 (quoting Selle v. Gibb, 741 F.2d 896, 904 (7th Cir. 1984)).

"Even if copying is established, it must be legally actionable." Vallery v. Am. Girl, L.L.C., 697 F. App'x 821, 824 (5th Cir. 2017) (per curiam). In determining "whether an instance of copying is *legally actionable*, a side-by-side comparison must be made between the original and the copy to determine whether a layman would view the two works as 'substantially similar.'" Id. (quoting Creations Unlimited, Inc. v. McCain, 112 F.3d 814, 816 (5th Cir. 1997)). To satisfy the substantial similarity test, the plaintiff must prove that a layman would "detect 'piracy without any aid or suggestion or critical analysis by others.'" Peel, 238

14

F.3d at 398 (quoting Harold Lloyd Corp. v. Witwer, 65 F.2d 1, 18 (9th Cir. 1933)).   The works must be so similar that "[t]he reaction of the public to the matter [is] spontaneous and immediate."   Id. (internal citations omitted).   A determination that no substantial similarity exists as a matter of law is "appropriate if the court can conclude, after viewing the evidence and drawing inferences in a manner most favorable to the nonmoving party, that no reasonable juror could find substantial similarity of ideas and expression." Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 142 (5th Cir. 2004).

To prove infringement of the copyright in a sound recording, also known as "sampling," a plaintiff must prove that his recording was physically reproduced. Newton v. Diamond, 388 F.3d 1189, 1192 (9th Cir. 2004).  With respect to a claim of unauthorized sampling, merely sounding like the plaintiff's recording is not sufficient. Bridgeport Music, Inc. v. Dimension Films, 410 F.3d 792, 800-01 (6th Cir. 2005).   Thus, summary judgment is warranted on a "sampling" claim if "a general audience would not recognize" that a portion of the allegedly infringing work "originate[d]" from the allegedly infringed work. See VMG Salsoul, Ltd. Liab. Co. v. Ciccone, 824 F.3d 871, 874 (9th Cir. 2016).

Finally, summary judgment is appropriate for any type of copyright infringement claim where a plaintiff fails to prove copyright ownership through proper registration of his copyright.

See <u>Geoscan, Inc. of Tex. v. Geotrace Techs., Inc.</u>, 226 F.3d 387, 392 (5th Cir. 2000).

*B.*

The defendants first challenge Mr. Batiste's ability to prove factual copying.  Notably, this Court has already ruled that Mr. Batiste must demonstrate "striking similarity" in order to prove factual copying.[9]  Because he has failed to produce for this record disputed factual similarities between his songs and those of the defendants that "are sufficiently unique or complex so as to preclude all explanations other than copying," the defendants contend that the plaintiff's copyright infringement claims fail as a matter of law.  <u>See</u> <u>Guzman</u>, 808 F.3d at 1039-40.  In his opposition papers, Mr. Batiste ignores the defendants' contention (and this Court's instruction) that he must establish a factual dispute regarding striking similarity, and he attempts to establish factual copying through evidence of access and probative similarity.

*i.*

Notwithstanding the plaintiff's obstinance, the Court considers whether he has presented evidence that raises a question of fact as to the issue of access – that is, whether the defendants

---

[9] In denying the defendants' motion to dismiss, this Court held that the plaintiff's second amended complaint failed to plead any facts concerning access but plausibly alleged "striking similarity."  <u>See</u> Order and Reasons dtd. 5/17/18.

16

had a "reasonable opportunity to view the copyrighted work[s] before creating the infringing work[s]." See Armour, 512 F.3d at 152-53 (internal citations omitted).

The defendants submit that there is no evidence that they had access to any of Batiste's songs at the time the Macklemore and Lewis songs were written. Ryan Lewis and Ben Haggerty have testified that, prior to this lawsuit, they had neither heard of Paul Batiste or Artang Publishing, nor listened to any of Batiste's music. Moreover, expert musicologist Brian Seeger, a tenured music professor at the University of New Orleans who "spend[s] a considerable amount of [his] time staying abreast of [] local music luminaries," insists that Mr. Batiste's "creative works are quite unknown in the local community of music fans and musicians" and "even in New Orleans, Mr. Batiste is flying under the radar of even the most informed music connoisseurs."

In an attempt to create a fact question as to the issue of access, Mr. Batiste contends that the defendants had a "reasonable opportunity to view his songs" because his musical works were "widely disseminated." Pointing to his own sworn declaration for support, Batiste submits that his songs have been broadcast on New Orleans radio stations, distributed to various disc jockeys, and sold in local and national record stores, on his website, at lives shows, and through digital platforms. According to Batiste, the fact that Macklemore and Ryan Lewis performed in New Orleans,

17

Louisiana on December 12, 2011 at a venue located "not too far" from where his music was being sold also supports an inference that they had a reasonable opportunity to view his music before releasing their album entitled "The Heist" during the fall of 2012.

"Taking the access and summary judgment standards together, a plaintiff can survive summary judgment only if his evidence is *significantly probative of a reasonable opportunity* for access." Armour, 512 F.3d at 153.  Thus, "[t]he question here is whether [Batiste] has produced more than speculation and conjecture regarding access by [the defendants]." Peel, 238 F.3d at 396.  On this record, he has not done so.  First, that Macklemore and Ryan Lewis performed in New Orleans "not too far" from a store in which Mr. Batiste's records are sold creates at best a hope for a "bare possibility of access."  See Guzman, 808 F.3d at 1037.  With respect to his dissemination theory, Batiste declares that his songs have been distributed nationally but submits materials reflecting no more than a handful of sales at two record stores located in Louisiana, and he concedes that his online sales have been "sparse."[10]  He also presents no evidence of "awards, billboard

---

[10] Batiste testified during his deposition as follows concerning his online sales:

> **Q.** [T]o define universe a little more, we're talking about iTunes and Spotify.  Is there anything else that Defendant's 21 encompasses, other than those two services?
> **A.** Um — it would be, um — more than that.  It may be a dozen.  But still, revenues were sparse at best.

charts, or royalty revenues" that would implicate a factual dispute that the defendants had heard his songs before releasing their own. Guzman, 808 F.3d at 1038; see also Arnett v. Jackson, No. 5:16-CV-872-D, 2017 U.S. Dist. LEXIS 128672, at *6 (W.D. N.C. Aug. 14, 2017).

*ii.*

Because Mr. Batiste has presented no evidence that is "*significantly probative of a reasonable opportunity* for access," to establish that the defendants copied his songs, he must demonstrate that his works and those of the defendants are "strikingly similar." See Armour, 512 F.3d at 153.

*a.*

Two works are "strikingly similar" if the plaintiff demonstrates "that the alleged 'similarities are of a kind that can only be explained by copying, rather than by coincidence, independent creation, or prior common source.'" Guzman, 808 F.3d at 1039 (quoting Selle v. Gibb, 741 F.2d 896, 904 (7th Cir. 1984)). The similarities in the work must "'appear in a sufficiently unique or complex context,' which is of particular importance 'with

---

**Q.** And I know I'm approaching being tedious now, but I'm also not very smart so. This Balance History, this statement, there's no other revenue that you're aware of that you are receiving from online distribution of your works.

. . .

**A.** Only TuneCore.

respect to popular music, in which all songs are relatively short and tend to build on or repeat a basic theme.'" Id. (quoting Benson v. Coco-Cola Co., 795 F.2d 973, 975 n.2 (11th Cir. 1986)). This "stringent" standard requires that the works be so similar that "the similarity could only be explained by actual copying." Armour, 512 F.3d at 152 n.3.  Indeed, the Fifth Circuit has held that two songs were not strikingly similar when the opening sixteen words of each song were identical, but other components of the composition, like the melody, tempo, and chord structures, were different.  Guzman, 808 F.3d at 1039-40.  Moreover, "[t]he test for 'striking similarity' . . . imposes a 'much higher standard' than that for 'substantial similarity,'" which is used to prove that an instance of copying is actionable.  Vallery v. Am. Girl Dolls, No. 13-5066, 2015 U.S. Dist. LEXIS 44709, at *6 (E.D. La. Apr. 6, 2015) (Knowles, J.), aff'd 697 F. App'x 821 (5th Cir. 2017) (quoting Guzman v. Hacienda Records & Recording Studio, Inc., No. 6-12-CV-42, 2014 U.S. Dist. LEXIS 169746, at *4-5 (S.D. Tex. Dec. 9, 2014)).

*b.*

With respect to his sampling claims, Mr. Batiste contends that the defendants copied his sound recordings and then manipulated them.  In so arguing, he appears to suggest that a lay listener would not be able to recognize the similarities in the works.  Accordingly, he points to circumstantial evidence in an

attempt to controvert Ryan Lewis's sworn declaration testimony that "[e]ach of the Macklemore & Lewis Songs was independently created and recorded by [Lewis] and Ben Haggerty," that "they do not include any sound recordings created by Plaintiff Paul Batiste," and that "none of Mr. Batiste's sound recordings are contained in [the audio files . . . that documented the process of creating the Macklemore & Lewis Songs] or were sampled in the Macklemore & Lewis Songs."

Mr. Batiste first points to evidence that the defendants have sampled other sound recordings to create new musical compositions. During his deposition, Ryan Lewis testified that he defines sampling as "taking a very small or larger piece of [a] song and incorporating it into a new production" and that he has used this tool to record some of his songs:

> **Q:** Have you ever independently found a song that you decided you would sample to make a beat?
> **A:** Yes.
>                        · · ·
> **Q:** Can't Hold Us?
> **A:** I think there's a percussion sample in that song.
> **Q:** Okay.  And what is the source of that percussion sample?
> **A:** It is from an old band from the British Invasion. It's blended with other parts of the drums.  I don't recall.
> **Q:** Did you receive any sort of licensing clearance from them to incorporate that into Can't Hold Us?
> **A:** I don't recall.  That's probably a good question for my manager.

Pointing to the sworn declaration of his counsel of record, DaShawn Hayes, for support, Batiste next submits that the Pro Tools

session that was used to compose and record the allegedly
infringing work, "Thrift Shop," contains "a plethora of sound
recordings of other artists, including but not limited to Jay-Z
and Dr. Dre," and displays an error message that 178 audio files
are missing. Mr. Hayes also attaches to his declaration an image
of the notification, which states that "178 audio files are
missing" and asks whether the user would like to, among other
options, "manually" or "automatically" "find & relink."

In response, the defendants produce evidence that the
"missing files" notification is a "common message" that appears
when Pro Tools files are moved across hard drives and does not
indicate that files are actually "missing." When asked about this
notification during his deposition, Mr. Lewis testified as
follows:

> **Q:** Is your testimony that when you switch sessions from
> hard drive to hard drive you will get the error message
> of audio files are missing?
>
> **A:** My testimony is that that's a standard message, and
> yes, that it is common. If you move the location of the
> audio files that it's looking for, then you have to allow
> it to find the new location. That's what automatically
> find and relink means. In terms of Thrift Shop or any of
> these sessions, they're several years old. I've had
> multiple different hard drives and multiple different
> computers that I've worked on in that time span.

Notably, the plaintiff has introduced no evidence disputing Mr.
Lewis's explanation of this Pro Tools message or otherwise
supporting his assertion that files are missing from the

defendants' Pro Tools session.  Moreover, that the files produced by the defendants contain other artists' sound recordings is immaterial.  Batiste argues that the presence of these files shows that the defendants sample other artists' works, but he presents no evidence that these artists' songs were sampled or are contained within any of the Macklemore and Ryan Lewis Songs.

More importantly, he has presented no probative evidence that the defendants have sampled any of his own works.  In the absence of any evidence of sampling, the Court has no option but to listen to the works themselves to determine whether the defendants reproduced the plaintiffs' sound recordings.

*c.*

After performing a listening comparison of each of Mr. Batiste's songs and the work that allegedly infringes it, and aided by the guidance of the defendants' expert musicologists,[11] the Court finds that the plaintiff has failed to demonstrate "striking similarity" or any instances of sampling with respect to the twelve song pairings identified in his complaint.

---

[11] The defendants have retained (1) expert musicologist Dr. Lawrence Ferrara of New York University to compare the plaintiff's and the defendants' musical compositions and evaluate the plaintiff's claims of similarity; (2) expert sound and recording engineer Paul Geluso, also of New York University, to analyze the plaintiff's claims of digital sampling; and (3) expert musicologist Brian Seeger of the University of New Orleans to offer additional analysis on the plaintiff's claims of compositional similarity and digital sampling.

(1)  "Thrift Shop" vs. Batiste's "Hip Jazz"

The plaintiff claims that "Thrift Shop" infringes the beat, drums, introduction, and bass line of "Hip Jazz." Although the Court was able to hear a faint similarity in the bass and beats used in these works, the resemblance was neither substantial, nor striking. This finding is supported by Dr. Ferrara's compositional analysis, in which he explains that the beats and drums of the two songs are markedly different, with only occasional generic similarities, and that the bass lines are only similar with respect to the use of a steady eighth note, which is commonly used. Insofar as Mr. Batiste claims that "Thrift Shop" samples the bass line of "Hip Jazz," Mr. Geluso and Mr. Seeger both conclude that sampling is impossible here because the bass line in "Hip Jazz" is not played in isolation.

(2)  "Thrift Shop" vs. Batiste's "World of Blues"

Mr. Batiste also alleges that "Thrift Shop" infringes the hook and melody of "World of Blues" to create its "distinctive saxophone melody." With respect to this pairing, the Court was unable to identify any similarity whatsoever. Although Batiste claims that the saxophone part of "Thrift Shop" was sampled, the Court did not hear anything that sounded like a saxophone in "World of Blues." Moreover, to the extent Mr. Batiste claims that the defendants copied the hook of "World of Blues" to create the hook of "Thrift Shop" that sings "I'll wear your granddad's clothes,"

24

Mr. Seeger has concluded that "there is nothing in *World of Blues* at the cited time that [he] would consider a hook."

(3)  "Thrift Shop" vs. Batiste's "Kids"

Batiste next claims that "Thrift Shop" infringes the 808 bass kick of "Kids" to create its distinctive kick melody.  Although the Court was able to recognize a kick-drum sound in both songs, it also noticed that the melodies and harmonies of the works are completely and strikingly different.  The Court's finding that these works are not strikingly similar is further supported by Mr. Seeger's insight that the "808 kick" is a universally available sound.  Moreover, with respect to Batiste's claim of sampling, Mr. Geluso explains that the 808 kick-drum sound in "Kids" is accompanied by other instrumentation.  Because the kick-drum sound in "Thrift Shop" is free of other sounds, Geluso concludes that "Kids" could not have been sampled.

(4)  "Neon Cathedral" vs. Batiste's "Tone Palette"

Mr. Batiste alleges that "Neon Cathedral" infringes the hook, melody, and chords of "Tone Palette."  To the Court's ear, these songs are not similar in any respect.  This finding is supported by Dr. Ferrara's compositional analysis, which reveals that the melodies are "very different."  Although Ferrara does identify similarities within the chord progressions, he notes that the chord progression used in "Tone Palette" is commonplace; he explains

25

that it is associated with flamenco music and found in many popular songs.

    (5) "Neon Cathedral" vs. Batiste's "Salsa 4 Elise (Fur Elise)"

Batiste next claims that "Neon Cathedral" infringes the hook, melody, and chords of "Salsa 4 Elise (Fur Elise)" to create its distinctive melody. With respect to this song pairing, the Court does notice a slight similarity in their melodies. But because "Salsa 4 Elise" is Batiste's rendition of Beethoven's "Fur Elise," this similarity is certainty *not* "of a kind that can only be explained by copying, rather than by coincidence, independent creation, or **prior common source**." <u>See</u> <u>Guzman</u>, 808 F.3d at 1039 (internal citations omitted) (emphasis added). That hardly rises to a dispute of material fact.

    (6) "Neon Cathedral" vs. Batiste's "Drowning in My Blues"

Batiste also claims that "Neon Cathedral" infringes the "drums" of "Drowning in My Blues." Although the Court did recognize a similar drum rhythm, these works are otherwise completely different. Moreover, Dr. Ferrara explains that the drum rhythms found in these two songs is also present in John Cougar Mellencamp's "Jack and Diane," which predates "Drowning in My Blues." Based on the foregoing, the Court finds that these works are not strikingly similar.

(7)  "Can't Hold Us" vs. Batiste's "Starlite Pt. 1"

The plaintiff next alleges that "Can't Hold Us" infringes the drums and bass line of "Starlite Pt. 1."  The Court was unable to hear any similarity with respect to the drums, bass line, or overall feel of these songs.  This finding is supported by Dr. Ferrara's compositional analysis, which also revealed no similarities between the drums and bass lines.  To the extent Batiste claims that "Can't Hold Us" sampled "Starlite Pt. 1," Mr. Geluso and Mr. Seeger both agree that sampling is not possible here because "Starlite Pt. 1" contains instruments and sounds that are not present in "Can't Hold Us."

(8)  "Can't Hold Us" vs. Batiste's "Love Horizon"

Batiste also claims that "Can't Hold Us" infringes the melody of "Love Horizon."  Once again, the Court was unable to identify any similarity between these works with respect to melody or overall feel.  Notably, "Can't Hold Us" is an upbeat party song, while "Love Horizon" is a slow-paced jazz work that features piano and guitar sounds.  Dr. Ferrara confirms that the melodies are "vastly different."

(9)  "Need to Know" vs. Batiste's "Move That Body"

Mr. Batiste next places "Need to Know" at issue, claiming that this work infringes and digitally samples the chords of "Move That Body."  To the Court's ear, the chord of "Move That Body" (at 1:56) does sound *somewhat* similar to the chord of "Need to Know"

27

(at 0:00), but the overall harmonies, rhythms, melodies, and lyrics of the two works are different. Moreover, Mr. Geluso and Mr. Seeger explain that no sampling has occurred because any digital sample of the chords from "Move That Body" would necessarily include drum sounds, which are absent from "Need to Know."

(10) "Need to Know" vs. Batiste's "Kids"

Batiste also claims that "Need to Know" infringes the melody and beat of "Kids." With respect to these song pairings, the Court was unable to identify any similarity whatsoever. The melodies and rhythms are completely different, and the overall feels of the songs have nothing in common. Once again, Mr. Geluso suggests that "Need to Know" could not have sampled the beat of "Kids" because the defendants' work does not contain the "scratching, bass kick drum, snare drum, hi-hats, or synth brass" sounds featured in the plaintiff's song.

(11) "Same Love" vs. Batiste's "My Bad"

Mr. Batiste next alleges that "Same Love" infringes the chord, hook, and verse of "My Bad." To the Court's ear, there is a *minor* similarity between the melodies of "My Bad" (at 0:44) and "Same Love" at (1:41). According to Dr. Ferrara, the songs share similar pitch sequences at these time positions, but their rhythmic durations differ. The defendants' expert musicologists also explain that Batiste's claims of sampling are impossible with respect to this sound pairing.

28

(12) "Same Love" vs. Batiste's "Sportsman's Paradise"

Finally, Batiste alleges that the defendants misappropriated the melody of "Sportsman's Paradise" to create the "beats/drums" and the "guitar melody" of "Same Love" and that they digitally sampled the "beat and bass" and "introduction" of his song.  With respect to the beats and drum bass of the two songs, the Court was unable to hear any similarities.  Mr. Ferrara confirms in his report that the kick drum rhythms and the bass in these works are "very different;" in "Same Love," the bass is almost non-existent, and there are no repeated sixteenth rhythms in hi-hat cymbal.  In addition, neither the Court, nor Mr. Seeger, could identify any guitar melody in "Same Love."

In light of this Court's determination that the plaintiff has presented no probative evidence to demonstrate that the defendants "factually copied" any of his musical compositions or sound recordings, the Court finds no material disputed issues of fact, and summary relief is appropriate on the record before the Court.

Accordingly, for the foregoing reasons, IT IS ORDERED: that the plaintiff's motion for leave to supplement is DENIED, and the defendants' motion for summary judgment is GRANTED.

New Orleans, Louisiana, April 23, 2019

MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE